tack on the judgment." *Hendrick v. Avent,* 891 F.2d at 587.

## C. *Privity*

 We dispose of appellants' final argument with brevity. On the issue of whether Elaine Shure or the estate of her deceased husband were parties to, or in privity with, Sure–Snap, and therefore also barred from bringing their causes of actions against the banks, we note their integral association to the business, and to the Chapter 11 proceeding. *See, e.g., Teltronics Services,* 762 F.2d at 190 (founder, president, chairman and shareholder of Chapter 11 company found to be in privity, and therefore barred from litigating previously litigated claims). Mrs. Shure, as president and CEO of the company, was its sole stockholder. She actually signed the voluntary petition for bankruptcy, the reorganization plan and disclosure statement. She later appeared as a co-plaintiff in the adversary proceeding. By the dictates of *In re Justice Oakes II, Ltd.,* 898 F.2d 1544, 1551 (11th Cir.1990), she thus "bec[ame] a party to that proceeding even if never formally named as such." As for Alfred Shure, because his wife is designated as the legal representative of his estate, and the law is well-settled on applying res judicata to third parties whose interests were represented by those closely aligned to them, we deem his estate bound by the preclusive effect of the first judgment as well.

## CONCLUSION

The Fifth Circuit has repeatedly recognized "the important interests in the finality of judgments in a bankruptcy case." *Hendrick,* 891 F.2d at 587, n. 9. *See also Matter of Howe, supra,* 913 F.2d at 1147. The First and Eleventh circuits, as well as a host of district courts, have also recognized the applicability of the time-honored principle of res judicata to confirmed, final bankruptcy hearings. We rule today, that in the context of lender liability claims that could have been brought before a final plan for reorganization was confirmed, but wer-

en't, the prior bankruptcy order was res judicata to the later action.

For these reasons, we affirm.

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Floyd Stevens HICKS, Defendant–**
**Appellant.**

**No. 90–5627.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 2, 1990.

Decided Oct. 23, 1991.

As Amended Nov. 21, 1991.

Locke Turner Clifford, McNairy, Clifford, Clendenin & Parks, Greensboro, N.C. and Daniel A. Kuehnert, Morganton, N.C., argued, for defendant-appellant.

Richard Stanley Glaser, Jr., Asst. U.S. Atty., Greensboro, N.C., argued (Robert H. Edmunds, Jr., U.S. Atty., on brief), for plaintiff-appellee.

Before PHILLIPS, Circuit Judge, CHAPMAN, Senior Circuit Judge, and HOUCK, District Judge for the District of South Carolina, sitting by designation.

## OPINION

HOUCK, District Judge:

Floyd Steven Hicks pled guilty to a one count indictment charging him with possession with intent to distribute 2,109.2 grams of cocaine in violation of 21 U.S.C. § 841(a)(1). He received a sentence of eleven years confinement to be followed by four years of supervised release and a fine of a $20,000.00. He appeals from that sentence on the grounds that the district court committed error in converting cash seized from his home to equivalent drug amounts for purposes of relevant conduct and in finding that he obstructed justice. We affirm.

On September 25, 1989, Ephraim Vandorian Stancil was arrested in Moore County, North Carolina, for conspiracy to possess with intent to distribute cocaine. Upon being taken into custody Stancil agreed to cooperate with law enforcement officers and made a statement indicating that Floyd Steven Hicks was a distributor of kilogram quantities of cocaine in the Moore County area. On the same date he talked to Hicks and arranged for the delivery of approximately two kilograms of cocaine for that evening at 9:45 p.m. at a dumpster located on Highway 211 in Moore County at Eagle Springs. Stancil was to bring the money, and Hicks was to bring the cocaine.

Surveillance was established by officers of the Drug Enforcement Agency (DEA), the North Carolina State Bureau of Investigation (SBI), and the Moore County Sheriff's Department at 9:00 p.m. that evening at the dumpster on Highway 211. Hicks arrived at 9:45 driving a white Honda four-door. When approached by the officers, Hicks fled the location in his car and was pursued for several miles in a high speed chase. During that time Hicks reached speeds of up to 95 miles per hour.

Once Hicks was stopped he was arrested, and a search of his person and car was conducted. No controlled substances were recovered at that time.

In a statement made following his arrest Hicks indicated that after he fled the scene, he threw two kilograms of cocaine from his car. He agreed, however, to show officers the area involved. The following day agents from the SBI and Sheriff's Department searched the area identified by Hicks as the location where he had thrown the cocaine. One kilogram was recovered in that search. The search resumed on September 27, 1989, and at that time the second kilogram was recovered.

On the night of his arrest Hicks also cooperated and gave officers permission to search his home at Seven Lakes subdivision in West End, North Carolina. A search of the residence conducted on that evening resulted in the seizure of approximately 107.4 grams of cocaine, approximately 18.8 grams of marijuana, a triple-beam scale,

and $279,550.00 in cash. In response to questioning regarding the cash, Hicks told a DEA agent that the "majority" of the money was the proceeds of drug transactions. The following day Hicks told another DEA agent that the money was to have been picked up by someone on the evening of September 25, 1989, and was then to be used to purchase cocaine.

Hicks was subsequently indicted and pursuant to a plea agreement pled guilty before Judge N. Carlton Tilley, Jr. At the conclusion of the proceeding the court instructed Hicks as follows:

> Mr. Hicks, I must order that you cooperate with the probation office in their compiling a presentence report involving this matter because they will be the ones who make the initial determination and recommendation of what guidelines apply and where you fit within the guidelines. So it is important that you cooperate.

Hicks responded affirmatively.

A pre-sentence report was later prepared by the United States Probation Office which calculated the recommended guideline sentence for Hicks and set forth the reasons therefor. The base offense level was established at 32 pursuant to U.S.S.G. § 2D1.1(a)(3). In arriving at that level the probation officer first considered all relevant conduct as required by U.S.S.G. § 1B1.3(a)(2), determining that the amount of cash seized from Hicks as well as the actual drugs should be considered in calculating the base offense level. Pursuant to *Application Note* 12 of U.S.S.G. § 2D1.1 and *Application Note* 2 of U.S.S.G. § 2D1.4, the seized cash was converted into an equivalent cocaine quantity.[1] The amount of actual drugs and the cocaine equivalent of the cash were then added together and converted into a common drug equivalent of 2,169.071 grams of heroin, as called for under *Application Note* 10 of U.S.S.G. § 2D1.1. This dictated the Base Offense Level of 32.

To the Base Offense Level of 32, 2 levels were added for obstruction of justice pursuant to U.S.S.G. § 3C1.1 and the application notes thereunder. The probation officer based this increase on several factors. Two events occurred on the night of Hicks' arrest, and they have been discussed in detail above. We refer to the high speed chase and the discharge of the cocaine from the car. Later, after being advised by the court at the guilty plea hearing that he should cooperate with the probation office in the preparation of his presentence report, Hicks lied to the interviewing officer about the amount of the fee he had paid his attorney. He stated to the officer that he had paid $6,000.00 in attorney's fees, when in fact the actual amount of fees he had paid was $60,000.00. The interview in which this information was given occurred on January 9, 1990. On January 19, Hicks' attorney contacted the probation officer and advised him of the true amount of the fee. The attorney said that his client had been unsure about how to respond to the question posed because of the "client/attorney" relationship. The probation officer concluded that the discrepancy was pertinent to the ability of Hicks to pay a fine and was, therefore, a material falsehood.

Hicks did receive a 2 level downward adjustment for acceptance of responsibility in accordance with U.S.S.G. § 3E1.1(a). When all additions and subtractions were made the probation officer calculated Hicks' total offense level to be 32.

The presentence report recommended a criminal history category of II. This determination was based on a previous conviction for driving under the influence.

After the presentence report was completed Hicks filed his objections thereto. In effect, he objected to all of the calculations resulting in the total offense level of 32, except for the 2 level decrease he received for acceptance of responsibility. He

---

1. In determining the drug equivalent of the cash the probation officer used a per kilogram value for cocaine of $32,000.00. This was the price agreed upon by Stancil and Hicks when Stancil set up their meeting on the evening of September 25. The $32,000.00 figure was then divided into the amount of cash seized, $279,550.00, to arrive at 8.736 kilograms of cocaine as the equivalent to the cash.

also objected to the calculation of a criminal history category of II.

At sentencing the court adopted the findings and recommendations of the presentence report in all respects, with the exception that it found a criminal history category of II to be excessive and reduced it to a criminal history category of I. Hicks appeals all of the adverse determinations made by the court at sentencing.

## I

Review of the district court's determinations under the Sentencing Guidelines is governed by 18 U.S.C. § 3742(e)[2]. We have previously considered this section and found as follows:

> The amount of deference due a sentencing judge's application of the guidelines to the facts ... depends on the circumstances of the case. If the issue turns primarily on a factual determination, an appellate court should apply the "clearly erroneous" standard. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985). If the issue, for example, turns primarily on the legal interpretation of a guideline term ... the standard moves closer to *de novo* review.... On mixed questions, courts have not defined any bright-line standard of review. Rather, the standard of review applied varies with the "mix" of the mixed question. If the question:
>
>> [I]s 'essentially factual,' ... the concerns of judicial administration will favor the district court, and the district court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on

the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.

*United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.) (en banc) (citations omitted), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

*United States v. Daughtrey,* 874 F.2d 213, 217–18 (4th Cir.1989).

## II

■ Hicks first raises as error the determination of the district court that the cash seized from his home should be considered as relevant conduct and used in determining the base offense level. The calculation of the amount of drugs which results in the establishment of the base offense level is a factual determination subject to review only for clear error. *Daughtrey,* 874 F.2d at 217–18.

Hicks' base offense level is determined by reference to § 2D1.1(a)(3). Therein it states that, for offenses not involving death or serious bodily injury, the offense level is that which is specified by the Drug Quantity Table set forth under subsection (c). The *Commentary* to this section indicates that "[t]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. *See* § 1B1.3(a)(2) (Relevant Conduct). If the amount seized does not reflect the scale of the offense, *see* Application Note 2 of the Commentary to

2. (e) Consideration.—Upon review of the record, the court of appeals shall determine whether the sentence—

   (1) was imposed in violation of law;

   (2) was imposed as a result of an incorrect application of the sentencing guidelines;

   (3) is outside of the applicable guideline range, and is unreasonable, having regard for—

      (A) the factors to be considered in imposing a sentence, as set forth in chapter 227 of this title; and

      (B) the reasons for the imposition of the particular sentence, as stated by the district

court pursuant to the provisions of section 3553(c); or

   (4) was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable.

The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.

§ 2D1.4." U.S.S.G. § 2D1.1, comment. (n. 12).

Section 1B1.3 provides:

§ 1B1.3. Relevant Conduct (Factors that Determine the Guideline Range) (a) *Chapters Two (Offense Conduct) and Three (Adjustments).* Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

. . . .

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction. . . .[3]

*Application Note* 2 of § 2D1.4 states:

Where there is no drug seizure *or the amount seized does not reflect the scale of the offense,* the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, *similar transactions in controlled substances by the defendant,* and the size or capability of any laboratory involved. (emphasis added)

It seems clear that the nature and type of offense charged here, along with the relevant facts, allows the consideration of the

drug equivalent of the cash seized as relevant conduct, and the district court properly computed Hicks' base offense level.[4]

We are not the only circuit to have so held. The Court of Appeals for the First Circuit did likewise in *United States v. Gerante,* 891 F.2d 364 (1st Cir.1989). There the defendant Gerante pled guilty to possession of 4.98 kilograms of cocaine. At sentencing the district court determined that $68,000.00 seized from Gerante's residence should be converted to an equivalent amount of cocaine and considered as relevant conduct in establishing Gerante's base offense level. Gerante appealed, maintaining that "the Guidelines ... did not permit the district court to convert the $68,000 into an estimated quantity of cocaine for the purpose of calculating the base offense level." *Gerante* at 368.

On appeal the First Circuit, relying on the guidelines and their commentary cited above, held that "the district court had the authority to determine that the amount seized from the defendant ... did not reflect 'the scale of the offense.'" *Gerante* at 369. The court went on to say that:

Using the "price generally obtained" for cocaine ($16,000 to $20,000), the district court had authority to (1) estimate the quantity of cocaine that Gerante had exchanged for the money; and (2) hold Gerante accountable for possessing this quantity of cocaine, provided, of course, that this amount of cocaine was part of the same course of conduct as that of the instant offense.

*Id.* at 369.

There is no doubt in the instant case that the money seized was part of the same

---

3. Section 3D1.2(d) provides that "[c]ounts are grouped together if the offense level is determined largely on the basis of ... *the quantity of a substance involved,* or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." (emphasis added)

4. In spite of the fact that Hicks said that only a "majority" of the cash seized from him came from drug sales, the district court converted all of the money to an equivalent amount of drugs. The only objection registered by Hicks was to the conversion itself. No objection was made to

the conversion of all of the cash instead of just a majority of it, nor is such an objection made in this appeal. Under these circumstances we need not address the issue. *See Wren v. United States,* 540 F.2d 643, 644 n. 1 (4th Cir.1975). The question does concern the court, however, and we have carefully reviewed the record to be sure that the same supports the action of the district court. This review, in particular Hicks' overall financial information, leads us to the conclusion that, even if the objection had been raised, there was ample evidence on which the district court could have found that all of the money was the proceeds of drug transactions.

course of conduct as the offense pled guilty to by Hicks, that course of conduct being the possession of cocaine with intent to distribute. Hicks admitted to DEA agents that he had obtained the money through other transactions and that, had it not been seized, it would have been picked up by an individual for use in the purchase of more cocaine. The ultimate conclusion drawn by the district court implicitly found that the money was part of the same course of conduct, as evidenced by the court's reference to the statements made by Hicks about the money's origins and future use.

That being the case, the amount of drugs seized did not accurately reflect the scale of Hicks' drug activity. This could be accomplished only by converting the drug money he had in his possession into its drug equivalency, and the district court was on sound ground when it did just that in calculating the applicable base offense level.

██ Hicks also argues that the enhancement of his sentence because of the money seized from him was tantamount to sentencing him for two crimes while he pled guilty to only one. He maintains that this violates his right to due process of the law.

This court has previously held that quantities of cocaine not charged in the count to which a guilty plea was entered may be relevant conduct for sentencing purposes. *United States v. Williams*, 880 F.2d 804 (4th Cir.1989). The same result is demanded where the relevant conduct is drug related money.

For the requirements of due process to be met, the factual evidence relied upon must "have some minimal indicium of reliability beyond mere allegation." *United States v. Smith*, 887 F.2d 104, 108 (6th Cir.1989) (*quoting United States v. Baylin*, 696 F.2d 1030, 1040 (3d Cir.1982)); *see also Williams v. Oklahoma*, 358 U.S. 576, 584, 79 S.Ct. 421, 426, 3 L.Ed.2d 516 (1959). There can be no doubt here as to the reliability which can be attached to the statements relied upon by the district court in determining that the money falls within the parameters of relevant conduct. Despite suggestions to the contrary in Appellant's Brief, the statements concerning the origins of the money and its future use were made by Hicks himself following his arrest, and he has never refuted them. Under such circumstances the reliability of the evidence cannot be contested.

## III

The next ground of error asserted by Hicks relates to the district court's finding that he obstructed justice within the meaning of § 3C1.1 of the Sentencing Guidelines. That section provides as follows:

If the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level by 2 levels.

The *Commentary* to this section states that the "section provides a sentence enhancement for a defendant who engages in conduct calculated to mislead or deceive authorities or those involved in a judicial proceeding, or otherwise to willfully interfere with the disposition of criminal charges, in respect to the instant offense." A wide range of conduct falls within the parameters of this section. The application notes give examples of certain types of conduct which it is intended to cover; however, the examples given are not exclusive.

As has been stated previously, the district court found that Hicks obstructed justice because (1) he fled when approached by officers, leading them on a high speed chase that lasted several miles, (2) during the course of the chase he threw the cocaine he had with him from the car, and (3) he misrepresented to the probation officer who was preparing the presentence report the amount of attorney's fees he had paid his attorney. It is unclear, however, whether these three were considered independently or in concert, but we are inclined to believe that the district court found each to independently support an adjustment for obstruction of justice. The parties, however, have chosen in this appeal to address flight from arrest and disposal of the cocaine as one basis for the adjustment and the misrepresentation to the probation offi-

cer as another. We do not believe that it matters how the grounds are considered; the same result will always be reached.

After Hicks' sentencing the guidelines were amended effective November 1, 1990.[5] We now turn specifically to the grounds upon which the district court based the finding of obstruction of justice.

### A

■ The question of whether flight from arrest qualifies as obstruction of justice requires an interpretation of the scope of the guidelines and as such the determination made by the district court is reviewed *de novo*. *Daughtrey*, 874 F.2d at 217–18.

■ Although this question has not often been directly addressed, the courts which have considered it seem to agree that mere flight is not enough to justify the two level increase provided for under § 3C1.1.[6] Something more is required to constitute obstruction of justice under § 3C1.1, such as the endangerment of the lives of law enforcement officers and innocent bystanders. *United States v. White*, 903 F.2d 457 (7th Cir.1990).

Hicks led officers on a high speed chase through a rural area for three to four miles. Speeds reached up to 95 miles per hour. The record does not reveal the extent to which the roadway in question was traveled, but we can assume that it had some regular traffic. Clearly, the lives of the law enforcement officers in pursuit were endangered, as were the lives of any unsuspecting motorists who may have been driving about on that evening. More than "mere flight" was involved, and the district court could correctly make a two level adjustment for obstruction of justice on that basis.

### B

■ We next consider Hicks' action in throwing the 2 kilograms of cocaine from his car during the course of the chase. Hicks maintains that since he later aided law enforcement in the recovery of the cocaine that it cannot be counted as obstruction of justice. This issue raises a question peculiar to the facts of this case and is subject to review under the clearly erroneous standard. *Daughtrey*, 874 F.2d at 217–18.

*Application Note* 1.(a) of § 3C1.1 states that "destroying or concealing material evidence, or attempting to do so" may constitute obstruction of justice. A literal reading of § 3C1.1, *Application Note* 1.(a), and the few cases interpreting the same causes us to conclude that Hicks' disposal of the cocaine while in flight constituted obstruction of justice. *See United States v. Cain*, 881 F.2d 980, 982 (11th Cir.1989) (Attempting to conceal stolen checks by throwing the cap containing the checks under a parked car constituted obstruction of justice.); *United States v. Galvan–Garcia*, 872 F.2d 638, 641 (5th Cir.1989) (Attempting to conceal marijuana by throwing it from the window of a car while fleeing

---

5. The U.S.S.G. under consideration have been amended in significant particulars since the time of this sentencing. In considering this appeal we have followed the guidelines as they existed at the time of sentencing, rather than those now in effect. *See United States v. Stephenson*, 921 F.2d 438 (2nd Cir.1990).

6. Our search revealed only five cases in which the issue has been directly dealt with. *See United States v. White*, 903 F.2d 457 (7th Cir.1990) (Mere flight without the attendant almost mortal circumstances in this case, including but not limited to the high speed chase through a heavily populated residential area endangering the lives, limbs and property of innocent pedestrians and law enforcement personnel, might not constitute "obstruction of justice."), *United States v. Stroud*, 893 F.2d 504 (2d Cir.1990)

(Mere flight in the immediate aftermath of a crime, without more, is insufficient to justify a § 3C1.1 obstruction of justice enhancement.), *United States v. Garcia*, 909 F.2d 389 (9th Cir. 1990) (Section 3C1.1 was intended to apply to something different from instinctive flight of a suspect who suddenly finds himself in the power of the law.), *United States v. Hagan*, 913 F.2d 1278 (7th Cir.1990) (The instinctive flight of a criminal about to be caught by the law does not justify a two level increase pursuant to § 3C1.1.), *United States v. Tellez*, 882 F.2d 141 (5th Cir.1989) (Attempted flight, which endangered not only the life of the arresting officer but the lives of innocent bystanders, and vigorous efforts after vehicle crashed into guardrail, provide adequate support for increase under § 3C1.1.).

constitutes obstruction of justice.); *United States v. Franco–Torres*, 869 F.2d 797, 800 (5th Cir.1989) (Throwing away gun, after firing at officers, in an attempt to hide it from officers is obstruction of justice.).

■ Hicks also argues that it is inconsistent to make an upward adjustment of 2 levels for obstruction of justice while making a downward adjustment of 2 levels for acceptance of responsibility.[7] As will be seen, this argument is without merit.

The Sentencing Guidelines clearly contemplate that this situation may arise and have dealt with it specifically. *Application Note 4* of § 3E1.1 says that "[c]onduct resulting in an enhancement under § 3C1.1 (Willfully Obstructing or Impeding Proceedings) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." An upward adjustment of 2 levels based on Hicks' attempt to dispose of the cocaine was warranted, and, given the degree of cooperation exhibited by Hicks after his arrest, the court cannot say that the district court was clearly erroneous in applying both sections of the guidelines.

### C

■ Finally we turn to Hicks' assertion that he did not obstruct justice when he lied to the probation officer about the amount of attorney's fees he had paid. Hicks maintains that the misleading statement he made to the probation officer was obtained in violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel.

Hicks has framed this issue in constitutional terms, and we shall first consider it as such, but the real question raised by this portion of his appeal is whether the false statement made by Hicks was "material" within the meaning of § 3C1.1.

■ It is well recognized that when a criminal defendant enters a plea of guilty he waives his right to remain silent. *See Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Moreover, the question of whether Miranda warnings are required prior to a routine presentence interview has been addressed by several other circuits. The determination which they have made, and which we feel is a sound one, is that Miranda warnings are not required prior to routine presentence interviews. *See United States v. Cortes*, 922 F.2d 123, 126 (2d Cir.1990); *United States v. Miller*, 910 F.2d 1321, 1326 (6th Cir. 1990); *United States v. Rogers*, 899 F.2d 917, 921 (10th Cir.1990); *United States v. Jackson*, 886 F.2d 838, 841–42 n. 4 (7th Cir.1989).[8]

■ Likewise, Hicks' Sixth Amendment right to counsel has not been violated. There is no such right at a routine presentence interview because the presentence interview is not a critical stage of the criminal proceedings. *See United States v. Jackson*, 886 F.2d 838, 843–44 (7th Cir. 1989); *Brown v. Butler*, 811 F.2d 938, 941 (5th Cir.1987); *Baumann v. United States*, 692 F.2d 565, 577–78 (9th Cir.1982). In explaining its rationale for this position, the Seventh Circuit has stated that the determination that such an interview is not a critical stage of the criminal proceedings is

---

**7.** Hicks received a downward adjustment of 2 levels for acceptance of responsibility pursuant to § 3E1.1(a). That section provides that "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels."

**8.** The United States Supreme Court has said that [t]he Fifth Amendment privilege against compelled selfincrimination is not self-executing. At least where the government has no substantial reason to believe that the requested disclosures are likely to be incriminating, the

privilege may not be relied upon unless it is invoked in a timely fashion. *Roberts v. United States*, 445 U.S. 552, 559, 100 S.Ct. 1358, 1363–64, 63 L.Ed.2d 622 (1980) (citations omitted). The court further stated that "[a]lthough *Miranda*'s requirement of specific warnings creates a limited exception to the rule that the privilege must be claimed, the exception does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." *Id.* at 560, 100 S.Ct. at 1364. Clearly a routine presentence interview is not inherently coercive.

based on the fact that the probation officer did not act on behalf of the government (the prosecution) and because the sentencing judge exercise[s] independent discretion and judgment in determining a defendant's sentence. In *Baumann,* the court reasoned that even if the probation officer recommended an aggravated sentence to the district judge because of the lack of remorse which he gathered from the defendant's responses during the interview, it remained the responsibility of the district judge to exercise his discretion in determining the appropriate sentence to be imposed. Thus, the *Baumann* court stated, "although [the defendant] may have been denied the advice of his attorney in making the 'significant decision of whether to submit to the [interview]' ... any such denial was constitutionally insignificant." 692 F.2d at 578.

*Jackson* at 844. The logic of this is unmistakable, and we agree that there is no such right to counsel at a routine presentence interview.

One final comment that the court feels compelled to make regards the most basic contention that Hicks somehow had a right to give a false statement to the probation officer. Even if the constitutional rights claimed by Hicks did actually attach to the presentence interview, his statement would not have fallen under those protections. At best, Hicks could have refused to answer the question or requested the presence of his attorney. Under no circumstances was he free to give a false answer. This is the position taken by the district court, and we agree.[9]

■ We now turn to the determination of whether the false statement made by him was "material." *Application Note* 1.(e) states that "furnishing material falsehoods to a probation officer in the course of a presentence or other investigation for

the court" may provide a basis for an upward adjustment under § 3C1.1. The question of materiality is a factual determination made by the district court and as such is subject to the clearly erroneous standard of review. *Daughtrey,* 874 F.2d at 217–18.

■ "A false statement is material if it is capable of influencing the investigation or prosecution of the offense." *United States v. Blackman,* 904 F.2d 1250, 1259 n. 11 (8th Cir.1990). The defendant need not be successful in obstructing justice through the false statement, since § 3C1.1 encompasses *attempts* to obstruct justice as well as actual obstruction. *United States v. Patterson,* 890 F.2d 69 (8th Cir. 1989). Additionally, the nature of a material false statement is not changed if the government or the court knows the statement to be false, *United States v. Blackman,* 904 F.2d at 1259, or later discovers, *United States v. Baker,* 894 F.2d 1083 (9th Cir.1990), or is told, *United States v. Lange,* 918 F.2d 707 (9th Cir.1990), the truth of the matter.

The district court found, as did the probation officer, that the false statement was "material" because it impacted on the ability of the court to impose an appropriate fine. In the course of the discussion between the court and defendant's counsel on this point the court specifically stated:

> It is necessary to have accurate information to have a financial statement upon which the Court may rely in making that determination. It may be in his favor; it may not be in his favor. But a misrepresentation about it which prevents the Court from being able to make that determination accurately is a misrepresentation and is an obstruction under the Guidelines.

A finding of materiality is implicit in this statement, but to imply materiality is unnecessary since the district court had previ-

---

9. During the sentencing hearing the district court made the following comments on this point:

He may refuse to give any answer and say that's a privileged and confidential matter and I'm not going to answer that. And I might accept that. I'm not so sure in this day and

time when fees may be confiscated that it is privileged. But accepting the original premise that it's a privileged matter, there is no privilege in giving a false answer to that. And a false answer is for the purpose of misleading. And it's in a material matter because it has to do with the financial situation.

ously found the falsehood told to the probation officer to be a "material matter." *See* fn. 9 supra.

The remarks made by the district court indicate that the matter was given careful consideration. We cannot hold that the finding made by the district court on this point was clearly erroneous.

We have addressed the grounds separately and found that each, in and of itself, is sufficient to support an upward adjustment for obstruction of justice. We reiterate, however, that if any one had failed, an upward adjustment would still have been warranted because when considered together, or in any combination, the reasons stated by the district court provided a sound basis for an adjustment for obstruction of justice.

Because Hicks has shown no error by the district court in its application of the Sentencing Guidelines to this case, the sentence imposed is

AFFIRMED.